# EXHIBIT A

DEVENS, NAKANO, SAITO,
 LEE, WONG & CHING

JAMES H.Q. LEE                2974-0
THOMAS J. WONG            3054-0
SOFIA HIROSANE McGUIRE  9299-0
1600 Central Pacific Plaza
220 South King Street
Honolulu, Hawaii  96813
Telephone No.:  (808) 521-1456
Facsimile No.:   (808) 523-0759
jhqlee@dnslwc.com
tjwong@dnslwc.com
shmcguire@dnslwc.com

**THE MILLER FIRM, LLC**
JEFF T. SELDOMRIDGE (pro hac vice to be filed)
108 Railroad Ave.
Orange, VA 22960
Telephone: (540) 672-4224
Fax: (540) 672-3055
jseldomridge@millerfirmllc.com

Attorneys for Plaintiffs
KATHLEEN KAIZUKA, Individually,
and as the child of Hiroshi Kagawa

**Electronically Filed**
**FIRST CIRCUIT**
**1CCV-24-0000458**
**11-APR-2024**
**09:43 AM**
**Dkt. 1 CMPS**

IN THE CIRCUIT COURT OF THE FIRST CIRCUIT

STATE OF HAWAII

| | |
|---|---|
| **KATHLEEN KAIZUKA, INDIVIDUALLY, AND AS THE CHILD OF HIROSHI KAGAWA**<br><br>                    Plaintiffs,<br><br>vs.<br><br>**SYNGENTA AG**<br>          Serve: P.O. Box<br>          CH-4002 Basel<br>          Switzerland | CIVIL NO._____<br>(Other Non-Vehicle Tort)<br><br>COMPLAINT; DEMAND FOR JURY TRIAL; and SUMMONS |

**SYNGENTA CROP PROTECTION, LLC**
    Serve: C T CORPORATION SYSTEM
    900 FORT STREET MALL, SUITE
    1680 HONOLULU, Hawaii 96813

**CHEVRON U.S.A. INC.**
    Serve: PHCS HAWAII, INC.SYSTEM
    1600 PAUAHI TOWER
    1003 BISHOP ST
    HONOLULU, Hawaii 96813

**YAMASHIRO BUILDING & SUPPLY, INC.**
    Serve: BYRON K. YAMASHIRO
    45-552 KAMEHAMEHA HWY
    KANEOHE, Hawaii 96744

JOHN DOES 1-10, JANE DOES 1-10, DOE PARTNERSHIPS, CORPORATIONS, or ENTITIES 1-20,

        Defendants.

## COMPLAINT

Plaintiff KATHLEEN KAIZUKA, Individually, and as the child of HIROSHI KAGAWA, by and through her undersigned counsel, Devens, Nakano, Saito, Lee, Wong & Ching and The Miller Law Firm, alleges the following allegations and claims against Defendants SYNGENTA AG, SYNGENTA CROP PROTECTION, LLC, CHEVRON U.S.A., INC., and YAMASHIRO BUILDING & SUPPLY, INC. (collectively, "Defendants"):

## PARTIES

### Plaintiffs

1.    Hiroshi Kagawa ("Mr. Kagawa" or "Decedent") was first exposed to Paraquat in or about 1963 when he began spraying the pesticide on his nursery in Hawaii. Hiroshi Kagawa

was exposed to Paraquat continuously from 1963 through 1973. Mr. Kagawa was diagnosed with Parkinson's disease in the late 1980's and died in 2005.

2.     From 1963 – 1973, Mr. Kagawa was regularly exposed to Paraquat as the owner and manager of his nursery. He regularly sprayed Paraquat at the nursery with Paraquat manufactured by Syngenta Crop Protection LLC, Syngenta AG, and Chevron U.S.A. Inc. The Paraquat was purchased by Mr. Kagawa from Yamashiro Building & Supply, Inc.

3.     Plaintiff Kathleen Kaizuka ("Ms. Kaizuka") is a citizen and resident of Hilo, Hawaii. Ms. Kaizuka is the daughter of Hiroshi Kagawa and lived with Mr. Kagawa on the nursery that he maintained and sprayed with Paraquat.

### Defendants

4.     Paraquat was first designed, manufactured, patented, and distributed by a British entity called Imperial Chemical Industries and its affiliates. Through a series of mergers and acquisitions, Imperial Chemical Industries and its affiliates' successors are Defendants Syngenta AG and Syngenta Crop Protection LLC ("hereinafter Syngenta"). This Complaint therefore ascribes Imperial Chemical Industries' and its affiliates' and successors' actions, as well as the actions of other companies to which Syngenta is a successor, to Syngenta.

5.     Syngenta AG is headquartered in Switzerland. Syngenta AG is the parent company of Syngenta Crop Protection LLC, a United States company incorporated in the State of Delaware with a principal place of business in North Carolina.  Syngenta AG has regularly transacted and conducted business within the State of Hawaii and has derived substantial revenue from goods and products, including Paraquat, used in the State of Hawaii and employs sales representatives in the State of Hawaii. Syngenta AG expected or should have expected its acts to have consequences

3

within the State of Hawaii because it derived substantial revenue from interstate commerce and invoked the benefits and protection of the State of Hawaii's laws.

6.     Syngenta entered into an agreement with the chemical company Ortho Division to design, manufacture, and distribute Paraquat in the United States. Through a series of mergers and acquisitions, Ortho Division and its successors' and affiliates' (including Chevron Chemical Company) ultimate successor is Defendant Chevron U.S.A. Inc. (hereinafter "Chevron") This Complaint therefore ascribes Ortho Division's actions, as well as the actions of its affiliates and other companies to which Chevron is a successor, to Chevron. Chevron also manufactured other products recommended for use with Paraquat. Syngenta has regularly transacted and conducted business within the State of Hawaii and has derived substantial revenue from goods and products, including Paraquat, used in the State of Hawaii and employs sales representatives in the State of Hawaii. Syngenta expected or should have expected its acts to have consequences within the State of Hawaii because it derived substantial revenue from interstate commerce and invoked the benefits and protection of the State of Hawaii's laws.

7.     Chevron is incorporated in Pennsylvania and its principal place of business is in San Ramon, California.  Chevron has regularly transacted and conducted business within the State of Hawaii and has derived substantial revenue from goods and products, including Paraquat, used in the State of Hawaii and employs sales representatives in the State of Hawaii. Chevron expected or should have expected its acts to have consequences within the State of Hawaii because it derived substantial revenue from interstate commerce and invoked the benefits and protection of the State of Hawaii's laws.

8.     Yamashiro Building & Supply, Inc ("YB&S") is a Hawaii corporation, headquartered in Kaneohe. YB&S sold Paraquat products to Mr. Kagawa.

4

## JURISDICTION AND VENUE

9.      This Court has personal jurisdiction over the above Defendants under Hawaii Revised Statues ("HRS") § 634-35, as the tortious conduct alleged herein arises within this state. Defendants are subject to the jurisdiction of the Court because they reside and/or conduct business in this Circuit and the tortious conduct alleged herein occurred within this Circuit.

10.     This Court has subject matter jurisdiction over this action under HRS § 603-21.5.

11.     Venue is proper before this Court under HRS § 603.36.

12.     Defendants Syngenta and Chevron U.S.A. are registered to conduct business in Hawaii, are present, have transacted and conducted, and continue to transact and conduct substantial business in Hawaii, have and continue to maintain a registered agent in Hawaii, consistently and purposefully avails itself of the privileges of conducting business in Hawaii and in this judicial district by marketing, distributing, promoting, and selling Paraquat in Hawaii as detailed further herein.   Chevron also contracted with Defendant YB&S within Hawaii. Furthermore, Syngenta and Chevron U.S.A committed tortious acts within this state fraudulently concealing the link between Paraquat and Parkinson's disease from potential Hawaii plaintiffs, including Mr. Kagawa.

13.     Plaintiffs Kathleen Kaizuka, Individually, and as child of Hiroshi Kagawa, Decedent, are and were residents of Hawaii and have suffered substantial emotional, physical, and financial injuries in Hawaii.  All Defendants have availed themselves to doing business in Hawaii, including the sale, distribution, marketing, and promotion of Paraquat products that have resulted in harm to Hawaii residents.

14.     Plaintiffs Kathleen Kaizuka, Individually, and as the child of Hiroshi Kagawa and Defendant YB&S are all citizens of Hawaii. Defendant YB&S is a Hawaii local defendant for purposes of removal and diversity jurisdiction.

## ALLEGATIONS

### *Discovery and Design of Paraquat*

15.     Paraquat is a man-made chemical formulation; it does not occur naturally.

16.     Paraquat was first discovered in the 1880s but, at that time, its herbicidal properties were not known.

17.     In the 1930s, organic chemists discovered "free radicals"—unstable molecules that damaged human cells, including the DNA in those cells. Free radicals can occur naturally or be caused by external stressors or substances. Free-radical molecules come to possess an uneven number of electrons. That uneven number allows them to easily react with other molecules through a process called "oxidation." Scientists discovered that a cascade of these oxidation reactions were toxic to human cells because they damaged the cells, interrupted their normal operation, and corrupted the cells' DNA. These cascades of oxidation reactions are sometimes called "redox cycling." And the net (toxic) effects of redox cycling are sometimes referred to as "oxidative stress."

18.     Prior to the 1950s, the same oxidative stress that was known to be toxic to human and animal cells was found to be toxic to plant cells.

19.     In or about 1955, scientists at Syngenta discovered that Paraquat caused redox cycling and oxidative stress. Syngenta scientists discovered that Paraquat cations would continuously and perpetually lose and then regain an oxygen ion. They realized that there was no

natural stoppage for this redox cycling; it would go on and on in perpetuity, causing significant oxidative stress.

20.     Syngenta scientists discovered that this redox cycling would result in oxidative stress that would be toxic to plant cells and interfere with a plant's ability to conduct photosynthesis. Paraquat-induced redox cycling and oxidative stress, the Syngenta scientists concluded, made Paraquat effective as an herbicide.

21.     Paraquat was effective as an herbicide because it induced redox cycling and caused oxidative stress in plants in the same way that the free-radical literature had documented redox cycling and oxidative stress disrupted the cellular function and damaged the cellular DNA of human cells. Indeed, in the 1950s Syngenta personnel commented that Paraquat was toxic, primarily affected the human central nervous system, and could be absorbed through human skin.

22.     However, Paraquat was not effective on its own. Without a surfactant, Paraquat would run off the leaves of plants instead of penetrating into the plant's cells where redox cycling could cause oxidative stress and disrupt photosynthesis. Syngenta scientists would test the many surfactants available on the market to determine their compatibility with Paraquat. Generally, these surfactants were non-ionic and readily available in the United States.

23.     Syngenta obtained various U.S. and U.K. patent protections for Paraquat in or about 1960 and 1961 and began selling Paraquat internationally in 1962.

24.     Generally, Syngenta would manufacture what it called "technical Paraquat," an essential form of the active ingredient that had to be formulated further into a final, sale-ready product.

*Syngenta's Partnership with Chevron*

25.     At roughly the same time that Syngenta obtained patent protection for Paraquat, Chevron was looking to increase its presence in the agricultural chemical market. Chevron already manufactured several agricultural chemicals, including non-ionic surfactants that could help herbicides penetrate a plant's dermis and attack a plant's cells. But Chevron sought to expand into herbicides and pesticides, which are sometimes referred to as "crop protection" business lines.

26.     As part of that expansion, on or about May 19, 1960, Chevron entered into an agreement with Syngenta that would allow Chevron to evaluate Paraquat for potential sale in the United States. Pursuant to that agreement, Syngenta supplied Chevron with information concerning Syngenta's Paraquat formulations, their herbicidal properties, and data relating to safety and exposure risk.

27.     Chevron reviewed these data and conducted extensive market research to determine the potential demand for Paraquat in the United States. During this period in the early 1960s, Chevron personnel reported that Paraquat was toxic and potentially hazardous to humans. Nonetheless, after several years of market evaluation and negotiation, Chevron and Syngenta decided to enter a partnership.

28.     On or about May 4, 1964, Syngenta entered into a licensing agreement with the Chevron, whereby Chevron would act as the exclusive formulator and distributor of Paraquat in the United States.

29.     The agreement also mandated that Syngenta and Chevron share information concerning the formulation, use, and sale of Paraquat, and permitted that information to be shared with companies Syngenta and Chevron contracted with to formulate or sell Paraquat. The companies also agreed to share information concerning end-user safety.

30.     Under the agreement, Syngenta would manufacture technical Paraquat and Chevron, along with other companies Syngenta and Chevron contracted with, would formulate the technical Paraquat into the use-ready Paraquat that Chevron would sell to distributors, and that would ultimately be purchased and used by an end-user.

### *Paraquat Was Known to be Unreasonably Dangerous*

31.     Before Paraquat was ever sold in the United States, both Syngenta and Chevron were aware that Paraquat was unreasonably dangerous.

32.     By 1958, internal Syngenta research reports opined that Paraquat was at least moderately toxic to humans, and that the main area of the human body affected was the central nervous system. Those research documents proposed further evaluation of Paraquat's toxicity before placing it into the stream of commerce. This research was either not done or its results were suppressed.

33.     By 1960, Syngenta was aware that Paraquat would undergo redox cycling and could accumulate in mammalian tissues.

34.     Similarly, by at least 1963, internal Chevron documents reveal that Paraquat was potentially hazardous to human health, and that insufficient research had been done to evaluate its potential neurotoxic effects.

35.     Further, following the start of global sales of Paraquat in 1962, Syngenta observed that workers involved in its manufacture of Paraquat were experiencing nose bleeds and other symptoms consistent with toxic exposure. As a result, Syngenta changed its manufacturing processes, creating a so-called "closed system" where engineering controls would prevent Syngenta employees from ever coming into contact with Paraquat.

9

36.     Syngenta shared this internal research data with Chevron. These data demonstrated that Paraquat was highly toxic and had the potential to seriously injure or kill humans exposed to highly-concentrated doses of the herbicide. The data also indicated that low-dose exposure had the potential to affect the human central nervous system.

37.     Nonetheless, after consummating their partnership, Syngenta and Chevron embarked on a full-scale joint operation to manufacture and sell Paraquat in the United States while hiding the risks of low-dose Paraquat exposure.

### Syngenta and Chevron Place Paraquat on the Market

38.     Prior to the first U.S. sale of Paraquat in 1964 or 1965, Syngenta and Chevron had to register Paraquat with various state and federal authorities, including the Hawaii Department of Agriculture. Registration required Syngenta and Chevron to agree on a formulation of the product.

39.     Aware that Paraquat was highly toxic to humans, Syngenta and Chevron jointly decided to minimize the appearance of toxicity. Both companies were aware—through internal research data as well as their experience designing and selling surfactants—that surfactants would dramatically increase the toxicity of Paraquat.

40.     For instance, internal Syngenta research documents show that surfactants were found to speed Paraquat's penetration into animal cells, increase the concentration of Paraquat in animal cells, and increase the bioavailability—that is, the proportion a substance that is able to actively affect the body—of Paraquat. These research documents conclude that the inclusion of surfactants in Paraquat formulations is likely to increase the Paraquat's toxicity.

41.     On information and belief, these data—or summaries of them—were shared with Chevron pursuant to their partnership agreement. Chevron and Syngenta held regular meetings to discuss (among other things) such topics.

42.    To mask Paraquat's toxicity, Syngenta and Chevron decided to sell Paraquat in the United States without a surfactant. The implications of that decision were twofold.

43.    First, Syngenta and Chevron jointly submitted scientific studies and reports in support of their applications to state and federal regulators that showed lower levels of toxicity than what would actually be experienced by end-users of Paraquat.

44.    Second, Syngenta and Chevron knew that requiring end-users to mix Paraquat with a surfactant before using it would dramatically increase the risk of low-dose Paraquat exposure. Internal company documents from both Syngenta and Chevron commented upon the increased risk that end-users would come into contact with Paraquat while mixing the herbicide with surfactant or cleaning equipment used in the mixing process.

45.    Meanwhile, Syngenta decided to sell Paraquat pre-mixed with surfactant in certain markets outside of the United States.

46.    Paraquat was registered by state and federal authorities using the Syngenta-produced, Chevron-submitted data that masked the risks of human exposure.

47.    Syngenta and Chevron began manufacturing, formulating, and selling Paraquat in the United States (including Hawaii) pursuant to their partnership agreement and without a pre-mixed surfactant in 1964 or 1965.

48.    Several of those products were accompanied by an instruction to use a particular surfactant: X-77 Spreader (sometimes called Ortho X-77). X-77 was designed and manufactured by Chevron and licensed to multiple other chemical companies for manufacture and/or distribution.

49.     Chevron produced ads and other promotional materials that referred to X-77 as more efficient and economical when used with Paraquat and recommended that end-users mix Paraquat with X-77 in particular.

### Syngenta and Chevron Create Nationwide Distribution Model

50.     As the sole U.S. formulator and distributor of Paraquat, Chevron lacked capacity to make all of the Paraquat needed to satisfy the increasing demand for the herbicide in Hawaii and throughout the United States.

51.     Consumer-ready Paraquat was shipped throughout the United States, sometimes directly to local distributors like farm collectives, supply stores, or agricultural organizations, and sometimes to mid-market wholesalers.

52.     Chevron and Syngenta also maintained a large network of sales personnel tasked with selling Paraquat to end-users. Chevron also embarked, with Syngenta's knowledge and approval, on aggressive marketing campaigns to promote Paraquat as the key to so-called "no-till" farming. Chevron also utilized the large sales networks of distributor sales personnel to promote Paraquat in Hawaii and elsewhere.

53.     These marketing efforts also included co-opting numerous "thought leaders" throughout Hawaii and the United States to encourage end-users to adopt aggressive Paraquat use. These thought leaders included agricultural extension services connected with major universities, agricultural colleges, academic researchers, and wholesalers (who often had name recognition in the agricultural community).

54.     These marketing efforts also included the production and distribution (in Hawaii and elsewhere) of ads and leaflets extolling the benefits of Paraquat. In many of these ads and leaflets, farmers are depicted using Paraquat without any personal protective equipment—they are

not wearing masks or gloves, not utilizing respirators; they are wearing everyday work clothes while mixing or spraying Paraquat.

### *Sales of Paraquat Mushroom as Evidence of Human Toxicity Mounts*

55.     Syngenta and Chevron's aggressive marketing efforts had their desired effect— shortly after sale of Paraquat began in the United States, it became a blockbuster.

56.     Many end-users purchased Paraquat from local farm collectives, supply stores, or agricultural organizations. And while, starting in the 1970s, Paraquat was technically a "restricted-use" pesticide—meaning that it was only supposed to be sold to licensed applicators who had received some basic safety training and passed a short exam—many local distributors sold to end-users (whom the local distributors had often known for years) who were not licensed applicators. In fact, many local distributors did not even mention the applicator requirement to purchasers of Paraquat, to the extent they knew of it themselves. And Syngenta and Chevron undertook no meaningful effort to ensure that only licensed applicators could acquire Paraquat.

57.     While the sales of Paraquat in Hawaii and nationwide mushroomed, evidence of the herbicide's toxicity to humans grew further.

58.     Beginning in the mid-to-late 1960s, just a few years after Paraquat came on the market, several acute exposure incidents became known to Syngenta and Chevron. In these incidents, an end-user would accidentally ingest or otherwise be exposed to a large dose of Paraquat. These incidents were almost always fatal—the victim would succumb to acute trauma to oxygen-rich organs, usually within a few days of exposure.

59.     These acute-exposure incidents often resulted in an autopsy of the victim, the results of which were supplied to Syngenta and Chevron. These autopsy results repeatedly showed

detectable amounts of Paraquat in the victim's brain, as well as other oxygen-rich organs like the lungs.

60.     Syngenta received similar autopsy results from outside the United States, which again showed that Paraquat was crossing the blood-brain barrier and entering the human brain.

61.     These external reports were confirmed by internal research available to both Syngenta and Chevron.

62.     In the face of mounting deaths from Paraquat poisoning, Syngenta was nonetheless resistant to updating its labeling to include a skull and crossbones out of fear that it would hurt their bottom line.  And Defendants never sought to include any language on the Paraquat labeling related to potential central nervous system injury.

63.     In 1969, Syngenta conducted (and shared with Chevron) a study that administered small amounts of Paraquat to lab animals via dermal exposure, oral exposure, and by injection into the abdomen. The study detected Paraquat in the exposed lab animals' brains, leading to the conclusion that Paraquat could enter the brain and cause neurotoxicity.

64.     Further research conducted in 1974 by Syngenta (and shared with Chevron and its contractors) revealed that Paraquat could pass through the blood-brain barrier by active transport. This means that instead of diffusing passively across the blood-brain barrier, Paraquat was actively transported by the body across the blood-brain barrier. Thus, Paraquat in the blood would ultimately end up in the brain.

65.     Additionally, research available in the public domain and known to Syngenta and Chevron and their contractors, demonstrated that inhaled chemicals could pass directly into the brain via the olfactory bulb. This research showed that the olfactory bulb is not protected by the

blood-brain barrier. Thus, Paraquat inhaled by an end-user can enter the brain directly through the olfactory bulb without having to traverse the blood-brain barrier.

66.     In about 1969, Syngenta scientists analyzing Paraquat concluded that low-dose exposure to the herbicide was likely to cause immediate neurotoxic damage, but that damage was unlikely to be detected until later. In other words, Paraquat was latently neurotoxic, Syngenta concluded. Chevron was made aware of these results and conclusions.

67.     At the same time that Syngenta and Chevron knew that Paraquat in the blood could get into the brain (or enter the brain directly via the olfactory bulb) and cause damage that would not be discovered until later, they knew that end-users were being exposed to Paraquat such that it entered their bloodstream.

68.     In 1969, a Syngenta scientist published the results of field studies conducted in Malaysia that attempted to measure the real-world Paraquat exposure of a Paraquat end user. The study followed several end-users as they mixed and sprayed Paraquat for agricultural purposes. The Syngenta researcher observed that workers generally did not wear protective equipment (and that none was supplied where they were working). Following Paraquat use, the researcher detected Paraquat in study participants' urine. Though the researcher did not analyze participants' blood, the fact that Paraquat was detectable in the participants' urine meant that it had been processed through participants' cardiopulmonary system and was in participants' blood.

69.     The results of this study were shared with or available to Chevron.

70.     Later, in or about 1980, Syngenta and Chevron jointly conducted a study of agricultural working conditions that concluded that workers often came into contact with Paraquat by touching equipment (including spraying and mixing equipment) contaminated with Paraquat with their bare hands.

15

71.     By the beginning of the 1980s, Syngenta and Chevron, as well as their contractors and agents, were aware that end-users were commonly being exposed to low doses of Paraquat, which was entering their blood and crossing over into their brains (or entering their brains directly via the olfactory bulb) and causing damage that would not be detected until later.

72.     Syngenta and Chevron were aware through field studies of the possibility of Paraquat to enter agricultural workers blood streams even if they were using protective equipment.

73.     Syngenta and Chevron were aware through field studies that agricultural workers often did not follow the product labeling, necessitating additional precautions to keep them safe.

### *Paraquat Becomes a Lab Favorite for Inducing Parkinson's*

74.     In 1982, after Syngenta and Chevron and their contractors and agents were aware that Paraquat was latently neurotoxic in end-users, the scientific community became aware of the connection between Paraquat and Parkinson's disease.

75.     That year, a group heroin users in California suddenly began exhibiting symptoms of advance-stage Parkinson's disease.

76.     Researchers determined that the heroin users had injected themselves with a chemical called MPTP as part of a botched attempt to get high. This discovery was a breakthrough in Parkinson's disease research because it allowed researchers to cause Parkinson's in lab animals using MPTP.

77.     Almost immediately, scientists began turning to Paraquat because it was widely available and, chemically, is almost identical to MPTP. Starting in the 1980s and continuing to today, researchers use Paraquat exposure to induce Parkinson's disease in lab animals.

78.     The reason Paraquat induces Parkinson's disease is that its redox cycling results in oxidative stress in the portion of the brain responsible for generating dopamine, the

neurotransmitter that controls voluntary movement. This oxidative stress interferes with dopamine production and results in Parkinson's disease.

79.     Parkinson's disease is a progressive neurodegenerative disorder of the brain that affects primarily the motor system—the part of the central nervous system that controls movement.

80.     The characteristic symptoms of Parkinson's disease are its "primary" motor symptoms: resting tremor (shaking movement when the muscles are relaxed), bradykinesia (slowness in voluntary movement and reflexes), rigidity (stiffness and resistance to passive movement), and postural instability (impaired balance), among others.

81.     Parkinson's disease's primary motor symptoms often result in "secondary" motor symptoms such as freezing of gait; shrinking handwriting; mask-like expression; slurred, monotonous, quiet voice; stooped posture; muscle spasms; impaired coordination; difficulty swallowing; and excess saliva and drooling caused by reduced swallowing movements, among others.

82.     Non-motor symptoms—such as loss of or altered sense of smell; constipation; low blood pressure on rising to stand; sleep disturbances; and depression—are present in most cases of Parkinson's disease, often for years before any of the primary motor symptoms appear.

83.     There is currently no cure for Parkinson's disease; no treatment will stop or reverse its progression. And the treatments most commonly prescribed for its motor symptoms tend to become progressively less effective, and to increasingly cause unwelcome side effects the longer they are used.

84.     When Paraquat enters the body, it enters the brain and causes selective degeneration and death of dopaminergic neurons (dopamine-producing nerve cells) in a part of the brain called the substantia nigra pars compacta ("SNpc").

85.     Dopamine is a neurotransmitter (a chemical messenger that transmits signals from one neuron to another neuron, muscle cell, or gland cell) that is critical to the brain's control of motor function (among other things).

86.     The death of dopaminergic neurons in the SNpc decreases the production of dopamine. Once dopaminergic neurons die, they are not replaced; when enough dopaminergic neurons have died, dopamine production falls below the level the brain requires for proper control of motor function, resulting in the motor symptoms of Parkinson's disease.

87.     The presence of Lewy bodies (insoluble aggregates of a protein called alpha-synuclein) in many of the remaining dopaminergic neurons in the SNpc is another of the primary pathophysiological hallmarks of Parkinson's disease.

88.     Dopaminergic neurons are particularly susceptible to oxidative stress, a disturbance in the normal balance between oxidants present in cells and cells' antioxidant defenses.

89.     Scientists who study Parkinson's disease generally agree that oxidative stress is a major factor—if not the precipitating cause of—the degeneration and death of dopaminergic neurons in the SNpc and the accumulation of Lewy bodies in the remaining dopaminergic neurons that are the primary pathophysiological hallmarks of the disease.

90.     Scientists seeking to study Parkinson's disease use Paraquat to create oxidative stress because of "redox properties" that are inherent in Paraquat's chemical composition and structure: it is a strong oxidant, and it readily undergoes "redox cycling" in the presence of molecular oxygen, which is plentiful in living cells.

91.     The redox cycling of Paraquat in living cells interferes with cellular functions that are necessary to sustain life-with photosynthesis in plant cells, and with cellular respiration in animal cells. The redox cycling of Paraquat in living cells creates a "reactive oxygen species"

known as superoxide radical, an extremely reactive molecule that can initiate a cascading series of chemical reactions that creates other reactive oxygen species that damage lipids, proteins, and nucleic acids, molecules that are essential components of the structures and functions of living cells. Because the redox cycling of Paraquat can repeat indefinitely in the conditions typically present in living cells, a single molecule of Paraquat can trigger the production of countless molecules of destructive superoxide radical.

92.     Syngenta, Chevron, and their contractors and agents, knew that Paraquat was neurotoxic, likely to enter the brains of end-users, and could cause Parkinson's disease in particular.

### *Chevron Becomes Uneasy and Partially Exits the Paraquat Market*

93.     Syngenta and Chevron's reaction to the growing scientific literature linking Paraquat and Parkinson's was not to amend the label, warn their customers, or otherwise take any precautions. Instead, they claimed publicly in ads, leaflets, and through sales personnel that no link existed.

94.     Despite their strong public statements to the contrary, worries grew within Chevron that Paraquat was neurotoxic.

95.     The risks Chevron perceived were not to its loyal customers and end-users, however. Instead, Chevron worried that the labels it had lobbied for with state and federal regulators would be deemed insufficient, which would cast aspersions on the company's credibility with regulators. And Chevron worried that it would be subject to mass tort liability for the latent injuries Paraquat was causing to end-users—the next asbestos, Chevron personnel fretted internally.

96.     But still, Chevron did nothing to warn the public or to alter its sales materials, which continued to depict farmers mixing and spraying Paraquat without wearing any protective equipment.

97.     Meanwhile, Syngenta appeared to show no such compunctions. Instead of worrying about being the next asbestos, Syngenta (consistent with its partnership agreement with Chevron) began to sell Paraquat in the United States independently of Chevron in 1982 or 1983.

98.     Chevron and Syngenta's partnership agreement was due to terminate in 1986 absent a renegotiation and renewal. Despite their worries about the neurotoxicity of Paraquat, Chevron engaged in multiple rounds of detailed negotiations with Syngenta with a view to securing an extension to their partnership.

99.     Ultimately, no such agreement was reached, and Chevron agreed to stop formulating and distributing Paraquat in or about 1986. However, Chevron still had a huge quantity of consumer-ready Paraquat in its possession. Some of that surplus was sold back to Syngenta, but some remained in Chevron's possession and, in addition to other Chevron-formulated Paraquat, was ultimately sold to distributors and end-users as late as approximately the mid-1990s.

100.    Part of Chevron's calculus in departing the Paraquat business was economic. In 1976, glyphosate had become available as another so-called "burn down" herbicide. Like Paraquat, glyphosate (which goes by the trade name Roundup) will kill just about any type of plant it comes into contact with. However, glyphosate is not as toxic in highly-concentrated doses and was perceived by many in agriculture as safer than Paraquat. Glyphosate is also sold pre-mixed with surfactant, making it cheaper and more convenient for end-users, who do not have to buy and mix a surfactant of their own.

101.     But a major part of Chevron's departure from the Paraquat business was its knowledge that Paraquat was already causing progressive neurodegenerative disease in its customers.

102.     At the time it ended its partnership with Syngenta, Chevron knew that there were no plans to warn end-users or anyone else about the dangers of low-dose Paraquat exposure.

103.     At the time it ended its partnership with Syngenta, Chevron knew that the surfactant it manufactured, X-77, was recommended for use with Paraquat, including on certain Paraquat labels that instructed end-users to use X-77.

104.     Chevron would continue to sell X-77 surfactants until at least 1993 and Chevron-designed and manufactured X-77 was still being sold on the market until at least approximately the late 1990s.

### Evidence of the Paraquat–Parkinson's Link Continues to Mount

105.      At all relevant times, Syngenta and Chevron failed to perform simple neurological testing  knowing that such testing would demonstrate the association of Paraquat and Parkinson's Disease/Neurological injury.

106.     In the registration or sale of Paraquat in the United States, Chevron did not conduct any toxicology or other studies on its own but instead relied on the studies of Syngenta. At all relevant times, Chevron possessed the technical capacity and resources to conduct toxicology and other studies of Paraquat but elected not to.

107.     Chevron later characterized Syngenta's studies as poorly done, outdated, and below the reasonable standards.

108.     Chevron had particular concerns that Syngenta had no evidence supporting claims that were no chronic effects of continual Paraquat exposure.

109.     Syngenta did not perform any long-term neurotoxicity testing on Paraquat until 2003.  At all relevant times, Syngenta possessed the technical capacity and resources to conduct such research.

110.     Chevron never performed any long-term neurotoxicity testing on Paraquat. At all relevant times, Chevron possessed the technical capacity and resources to conduct such research.

111.     Syngenta and Chevron refused to perform any neurotoxicity testing on Paraquat with surfactant as used in a real-world application despite having the technical capacity and resources to do so.

112.     As the years progressed, evidence that Paraquat causes Parkinson's continued to mount. In light of this, Syngenta commissioned a series of in-house studies in 2003 to attempt to validate the scientific literature, which by then showed a significant decrease in dopaminergic neurons as a result of Paraquat exposure.

113.     In the first round of studies, a Syngenta scientist used a manual method for counting dopaminergic neurons. This led the scientist to conclude that there was no statistically-significant loss of dopaminergic neurons following Paraquat exposure, thereby contradicting the growing scholarly literature and supporting Syngenta's public statements that Paraquat does not cause Parkinson's disease.

114.     Syngenta saw to it that the scientist's conclusions were published to much fanfare and widely reported in various outlets.

115.     But the same Syngenta scientist later gained the ability to conduct a more precise, automated count of dopaminergic neurons. The Syngenta scientist then repeated the same studies, this time using the more precise counting method. In this second round, the scientist discovered a statistically-significant loss of dopaminergic neurons following Paraquat exposure. The scientist

22

concluded that, thanks to the more precise methodology in the second round of studies, it was highly likely that the growing body of scientific literature was correct: Paraquat exposure is associated with loss of dopaminergic neurons.

116.    Unlike the first round of studies, Syngenta never published or otherwise publicly released the second round of the scientist's studies—the ones linking Paraquat to Parkinson's disease.

117.    Though, to date, Syngenta has never contested the results of the second round of studies, they have withheld them from the public, the medical and scientific communities, and regulators. Syngenta has, however, repeatedly referred to the first round of studies publicly and in submissions to state and federal regulators.

118.    In about 2004 or 2005, Syngenta communicated to its internal scientific and toxicology teams that under no circumstances should Paraquat be measured in the brain tissue of lab animals because detecting even a small amount could have negative implications for the company.

119.    In addition to suppressing the results of its own studies showing a Paraquat-Parkinson's connection, Syngenta has also engaged in an active campaign to discredit outside scientists whose research supports the growing consensus that Paraquat causes Parkinson's disease.

120.    For instance, Syngenta established a so-called Paraquat SWAT team to attack and discredit scientists whose results are contrary to Syngenta's public statements. That team has taken various actions, including pressuring publishers to remove the word "Paraquat" from abstracts of scientific articles, apparently on the theory that few people read beyond the abstract.

23

121.    Syngenta also retained v-Fluence to develop a website called "paraquat.com," which claims to share up-to-date information on the safety of Paraquat. Syngenta made efforts to promote paraquat.com such that it would appear higher in Google search results as opposed to other websites that might have warned end-users of Paraquat's dangers. The EPA page on Paraquat even directs consumers to "paraquat.com." The website falsely states that the science does not support a link between Paraquat exposure and Parkinson's disease, despite Defendants' knowledge to the contrary.

122.    Independent Syngenta studies tell a vastly different story about the neurotoxicity of Paraquat. To begin with, several Syngenta-conducted or -commissioned studies from the late 1990s and early 2000s confirmed what studies from earlier periods had already discovered: the intended users of Paraquat rarely used full safety equipment and came into frequent contact with small amounts of Paraquat while mixing (including adding the required surfactant) and spraying the herbicide. For instance, a 1995 study of workers in U.S. orchards found that only half of Paraquat users wore gloves.

123.    Further, a 1997 Syngenta study based in Spain required workers to wear the recommended personal protective equipment as a condition of study participation. Syngenta personnel monitored the study participants to ensure that they used full personal protective equipment at all relevant times during the study. But despite these (mandatory) precautions, almost all of the study participants tested positive for Paraquat in their urine.

124.    Other studies continued to confirm that Paraquat enters the brain. Concerned that lab rats may be too different from humans to generalize earlier findings, Syngenta commissioned a study using squirrel monkeys in 2010. Following administration of small, fixed doses of Paraquat, the squirrel monkeys were actually found to be *more* sensitive to Paraquat toxicity than

mice. What's more, analysis of the monkey's frontal cortex region showed no measurable decline in Paraquat levels in samples taken six weeks apart. Syngenta scientists concluded that Paraquat can enter the brain, that mammals similar to humans are more sensitive to the neurotoxic effects of Paraquat than lab rats, and that Paraquat does not easily leave the brain once there.

125.    Syngenta did not publish the squirrel monkey studies. Nor did it report them to state or federal regulators. Syngenta kept these studies hidden.

126.    But Syngenta did, in 2011, publish the results of what it called an epidemiological study of Syngenta employees involved in Paraquat manufacturing. The study purported to show that there is no statistically-significant increase in the prevalence of Parkinson's disease among Syngenta employees who manufactured Paraquat. But the study was rejected by every reputable journal to which it was submitted. Even Syngenta's own internal reviewers questioned the study's validity. For one thing, Paraquat manufacture is a closed process: workers in the study (unlike Paraquat end-users) did not actually come into contact with Paraquat during manufacturing. Further, the Syngenta doctor that conducted the study relied exclusively on workers' death certificates to determine whether or not they had Parkinson's disease—a notoriously unreliable methodology because death certificates rarely list underlying conditions that ultimately cause death. In the end, Syngenta paid a substantial fee to publish the study in an open-source journal.

127.    Despite these shortcomings, Syngenta has frequently cited this study as disproving any epidemiological link between Paraquat and Parkinson's disease, both to the public and to state and federal regulators.

128.    Paraquat.com falsely claims that there is no epidemiological evidence of a Paraquat-Parkinson's connection. Syngenta has never conducted an epidemiological study save for the fatally flawed 2011 study that it essentially self-published.

25

***Syngenta seeks assistance to Misrepresent the Risks of Paraquat Knowing that the Product was Neurotoxic and Could Cause Parkinson's Disease***

129.    In 2002, Syngenta entered into a contract with v-Fluence to provide research, online monitoring, and counsel on issues management as it related to Paraquat.

130.    In July 2002, v-Fluence forwarded Syngenta a study noting deformity in frogs when exposed to pesticides.  v-Fluence recommended that Syngenta use third-party groups and experts to respond to the toxicity claims. v-Fluence advised Syngenta that any direct comments from the company would only reinforce the researchers' statements and give them more credibility. v-Fluence offered to provide a written response to downplay any safety risks and reaffirm Syngenta's commitment to safety while reiterating farmers' need for pesticides. Syngenta adopted these recommendations and implemented them into their corporate strategy for the next 20 years.

131.    On or about October 8, 2002, Syngenta and v-Fluence formally amended their agreement to provide research, online monitoring, and counsel on issues management as it related to Paraquat. In the Addendum to the contract, v-Fluence noted that Paraquat is a leading target of activists and that other countries had not renewed the registration of Paraquat.

132.    In October 2002, v-Fluence notified Syngenta of an Action Alert from the Pesticide Action Network (PAN).  The Alert from PAN referred to Paraquat as was one of the world's most deadly pesticides while asserting that Paraquat posed an unacceptable risk to the health and safety of product user and that several safer alternatives existed. Syngenta authorized v-Fluence to begin investigating PAN to formulate an attack and develop a strategic response.

133.    In November 2002, v-Fluence drafted and provided Syngenta with a report analyzing Paraquat in the online landscape. In its report, v-Fluence noted that there were numerous reports linking Paraquat exposure to Parkinson's disease. v-Fluence, however, noted that Paraquat was not a "hot topic" for the public with fewer than 800 nationwide, monthly searches.

26

134.    In its November 2002 report on Paraquat, v-Fluence provided Syngenta with short term recommendations on how to identify and combat emerging public concerns and neutralize critics of Paraquat. v-Fluence recommended that Syngenta develop simple messaging to contest negative information associating Paraquat with Parkinson's disease, utilize third parties to publicly leverage the safety profile of Paraquat in the media, develop a rapid-response program to generate real-time responses to attacks on Paraquat, and create Paraquat.com, a website where Syngenta could implement these tactics.

135.    From 2002 to the Present, v-Fluence assisted Syngenta in using search engine optimization tools and other means to manipulate the information that would appear on internet searches related to Paraquat and direct consumers to Paraquat-friendly content, including Paraquat.com.  v-Fluence would further monitor the internet searching habits of the general public to determine whether those searches would lead to information regarding Paraquat's neurotoxicity; and provide recommendations and strategies to manipulate the online environment to make information regarding the neurotoxicity of Paraquat more difficult to find.

136.    Syngenta created Paraquat.com for the direct purpose of denying, minimizing, and neutralizing negative safety information relating to Paraquat. Paraquat.com has been continuously used by Syngenta to deny any association between Paraquat and Parkinson's disease.

137.    In September 2003, Syngenta executives developed a plan for handling threats to Syngenta and its products and defend the company's license to operate. At the meeting, the group developed strategies to influence product users, proactively taking positions on regulatory actions, and using third party advocates to make Syngenta's case to regulators and the public. The participants acknowledged that Paraquat was being attacked and that many Syngenta employees shared these negative perceptions of Paraquat. The participants used Paraquat as a case study in

how to deal with regulatory agencies in the future and agreed that the company needs to be proactive and adopt an approach of "defend or be damned." It was agreed that Syngenta should enforce a policy of rebuttal against opponents of Paraquat.

### *Warnings of a Paraquat–Parkinson's Link*

138.    At no time has Syngenta publicly warned that exposure to Paraquat could cause Parkinson's disease or a precursor ailment.

139.    At no time has Chevron publicly warned that exposure to Paraquat could cause Parkinson's disease or a precursor ailment.

140.    This despite the fact that Syngenta and Chevron have admitted in that a Paraquat-Parkinson's causal connection is biologically plausible, that the numerous internal studies that they have conducted and shared with each other and their contractors and agents demonstrate a Paraquat-Parkinson's causal connection, and that numerous independent epidemiological studies have sounded the alarm of the catastrophic consequences.

141.    All Defendants continue to publicly assert that Paraquat is safe and that it does not cause Parkinson's disease or precursor ailments.

142.    Defendants committed, and continue to commit, affirmative independent acts of concealment (including acts and omissions) to intentionally mislead end-users and the medical community as alleged above. This concealment prevented end-users, including Mr. Kagawa, from asserting their legal rights because the facts to support their causes of action were not apparent to a reasonably diligent person.

143.    By 2005, Syngenta were aware that it would be subjected to a large number of lawsuits by plaintiffs who developed Parkinson's disease if the general public became aware of the science supporting the link between Paraquat and Parkinson's disease.

144.    To combat this potential for litigation, Syngenta thus embarked on a coordinated effort to generate scientific literature through paid contractors and through the publication of studies Syngenta knew to be highly flawed. Syngenta used this flawed science to attempt to invalidate the growing consensus by independent scientists and regulators that Paraquat caused Parkinson's disease.  Through this fraudulent manipulation of the scientific literature and to monitor and manipulate information in the media and the internet; Syngenta was able to conceal from victims of Paraquat, such as Mr. Kagawa, their legal cause of action and right to compensation.  Only until recently has some evidence of Syngenta's malfeasance become partially publicized.  Through Syngenta's efforts, they were able to forestall a mass tort action against it for decades allowing it to make substantial profits as it continued to sell Paraquat. Mr. Kagawa suffered emotionally and financially as a result of Syngenta fraudulent concealment of the dangers of Paraquat and of the facts supportive of Plaintiffs' cause of action against Syngenta.

145.    Defendants committed, and continue to commit, acts of fraud that caused end-users, including Mr. Kagawa, to relax their vigilance or deviate from their right of inquiry into the facts alleged in this complaint.

### Plaintiff Hiroshi Kagawa Was an End-User of Paraquat and Exposed in Reasonably Foreseeable Ways

146.    Decedent Hiroshi Kagawa was first exposed to Paraquat in 1963. Mr. Kagawa lived and worked in Hawaii. Decedent Hiroshi Kagawa at all relevant times of exposure was a citizen and resident of Hawaii.  Hiroshi Kagawa is the deceased and father of Kathleen Kaizuka.  Decedent was exposed to Paraquat that he sprayed on his family nursery in which he resided from 1963-1973.  Decedent was diagnosed with Parkinson's disease in 1980's.  Decedent died in 2005.

147.    Mr. Kagawa was exposed to Paraquat (1) when it was mixed, loaded, applied, and/or cleaned; (2) as a result of spray drift (the movement of Paraquat spray droplets from the

target to area to an area where Paraquat application was not intended, typically by wind); and/or (3) as a result of contact with sprayed plants and equipment covered in Paraquat. Paraquat came into contact with Mr. Kagawa's skin and clothes. Mr. Kagawa inhaled Paraquat.

148.    Mr. Kagawa was exposed to Paraquat designed by Syngenta.

149.    Mr. Kagawa was exposed to Paraquat manufactured by Syngenta.

150.    Mr. Kagawa was exposed to Paraquat distributed by Syngenta.

151.    Mr. Kagawa was exposed to Paraquat designed by Chevron.

152.    Mr. Kagawa was exposed to Paraquat manufactured by Chevron.

153.    Mr. Kagawa  was exposed to Paraquat distributed by Chevron.

154.    Mr. Kagawa was exposed to Paraquat sold and distributed by Yamashiro Building & Supply, Inc

155.    Mr. Kagawa used Paraquat as intended—that is, as an herbicide.

156.    Mr. Kagawa would not have purchased or used Paraquat if he had known that it could cause neurological injury or Parkinson's disease.

157.    At all relevant times, it was reasonably foreseeable that when Paraquat was used in the intended or a reasonably foreseeable manner, users of Paraquat and persons nearby, such as Mr. Kagawa, would be exposed to it.

158.    At all relevant times, it was reasonably foreseeable that Paraquat could enter Mr. Kagawa's body: (1) through absorption or penetration of the skin, mucous membranes, and other epithelial tissues (including tissues of the mouth, nose and nasal passages, trachea, and conducting airways, particularly where cuts, abrasions, rashes, sores, or other tissue damage were present); (2) through the olfactory bulb; (3) through respiration into the lungs; and (4) through ingestion into

the digestive tract of small droplets swallowed after entering the mouth, nose, or conducting airways.

### *Plaintiff Hiroshi Kagawa Was Injured by His Contact with Paraquat*

159.    As a result of Mr. Kagawa's contact with Paraquat, he developed Parkinson's disease.

160.    Parkinson's disease is progressive and cannot be diagnosed using a blood test or other immediately-verifiable methodology.

161.    Many individuals who suffer from, and will ultimately succumb to, Parkinson's diseases do not yet have a Parkinson's disease diagnosis.

162.    Precursor ailments consist of symptomologies consistent with Parkinson's disease and with an eventual Parkinson's disease diagnosis.

163.    Mr. Kagawa's Parkinson's disease progressed to become entirely debilitating. Mr. Kagawa lost the ability to control his motor functions. Mr. Kagawa became unable to live independently. Parkinson's disease resulted in permanent physical injuries, pain, mental anguish, and disability.

164.    Mr. Kagawa suffered general (non-economic) damages in a sum in excess of the jurisdictional minimum of this Court.

165.    Mr. Kagawa suffered special (economic damages) in a sum in excess of the jurisdictional minimum of this Court.

### *Plaintiffs' Claims Are Timely*

166.    Plaintiffs filed suit within two years of learning that Mr. Kagawa's exposures to Paraquat and/or surfactant designed, formulated, and manufactured by Defendants caused his Parkinson's disease or precursor ailment.

167.    Plaintiffs had no reason to suspect that Mr. Kagawa's injuries had anything to do with his exposure.

168.    Plaintiffs were never told either by a medical professional, by media, or by the Defendants, that exposure to Paraquat could cause Mr. Kagawa to suffer Parkinson's disease or a precursor ailment.

169.    Plaintiffs did not know of the claims and  underlying facts asserted in this complaint, nor could any reasonable prudent person know of such claims.

170.    Plaintiffs did not possess the sufficient critical facts to put them on notice that the wrongs and the acts and omissions discussed herein had been committed because Defendants were and continue to conceal the acts and omissions noted herein.

171.    At all relevant times, Plaintiffs exercised reasonable diligence in investigating potential causes of their injuries by discussing their injuries with healthcare providers. None of the conversations gave Plaintiffs a reason to suspect, or reasonably should have given Plaintiffs a reason to suspect, that Paraquat or Defendants' tortious conduct was the cause of such injuries.

172.    Plaintiffss were reasonably unaware, and had no reasonable way of knowing, that the injuries described above were caused by Defendants' conduct.

173.    Further, Defendants' acts and omissions misled Plaintiffs in regard to their causes of action and prevented them from asserting such rights because the facts which would support their causes of action as alleged in this complaint were not apparent to a reasonably prudent person.

174.    Defendants also prevented Plaintiffs from asserting their rights by committing affirmative independent acts of concealment as noted above upon which Plaintiffs  relied.

175.    Defendants' misconduct and fraudulent concealment of the relevant facts deprived Plaintiffs and Mr. Kagawa's physicians of vital information essential to the pursuit of the claims

in this complaint, without any fault or lack of diligence on their part. Plaintiffs relied on Defendants' misrepresentations and omissions and therefore could not reasonably have known or become aware of facts that would lead a reasonable, prudent person to make an inquiry to discover Defendants' tortious conduct.

176.    Defendants also affirmatively induced Plaintiffs to delay bringing this complaint by and through their acts and omissions as alleged herein.

177.    In addition to the acts and omissions noted above, Defendants consistently misrepresented to Plaintiffs and/or Mr. Kagawa' physicians that Paraquat was not the cause of any of Mr. Kagawa's injuries to delay their bringing a claim against Defendants.

178.    Plaintiffs relied on Defendants misrepresentations.

*Plaintiffs Make No Claims Under Federal Law*

179.    Paraquat is regulated by government authorities, but Plaintiffs make no allegations under those statutes or their implementing regulations.

a.    The Hawaii Pesticide Laws and Regulations, which regulates the labeling, distribution, use, and application of pesticides within Hawaii, requires that pesticides be registered with the Hawaii Department of Agriculture before they are sold in Hawaii.

b.    The Federal Insecticide, Fungicide, and Rodenticide Act ("FIFRA"), 7 U.S.C. § 136 et seq., which regulates the distribution, sale, and use of pesticides within the U.S., requires that pesticides be registered with the U.S. Environmental Protection Agency ("EPA") prior to their distribution, sale, or use, except as described by FIFRA. 7 U.S.C. 136a(a).

      c.     FIFRA has no private right of action and state tort claims do not arise under FIFRA.

180.    The distribution or sale of a pesticide that is misbranded is an offense under FIFRA, which provides in relevant part that "it shall be unlawful for any person in any State to distribute or sell to any person ... any pesticide which is ... misbranded." 7 U.S.C. § 136j(a)(1)(E). A pesticide is misbranded under FIFRA if, among other things: (1) its labeling bears any statement, design, or graphic representation relative thereto or to its ingredients which is false or misleading in any particular, 7 U.S.C. § 136(q)(1)(A); (2) the labeling accompanying it does not contain directions for use which are necessary for effecting the purpose for which the product is intended and if complied with, together with any requirements imposed under section 136a(d) of this title, are adequate to protect health and the environment, 7 U.S.C. § 136(q)(1)(F); or (3) the label does not contain a warning or caution statement which may be necessary and if complied with, together with any requirements imposed under section 136a(d) of this title, is adequate to protect health and the environment," 7 U.S.C. § 136(q)(1)(G).

181.    As a result, a pesticide may be misbranded despite an EPA determination that it met FIFRA's registration criteria. In other words, notwithstanding its registration, a pesticide is misbranded if its label contains "false or misleading" statements, has inadequate instructions for use, or omits warnings or cautionary statements necessary to protect human health. Similarly, a pesticide may be found to cause unreasonable adverse effects on humans when used according to the approved label despite a determination by the EPA that it would not.

182.    Plaintiffs do not seek in this action to impose on Defendants any labeling or packaging requirement in addition to or different from those required under FIFRA. Any allegation in this Complaint that a Defendant breached a duty to provide adequate directions for the use of or

warnings about Paraquat, breached a duty to provide adequate packaging for Paraquat, concealed, suppressed, or omitted to disclose any material fact about Paraquat, or engaged in any unfair or deceptive practice regarding Paraquat, is intended and should be construed to be consistent with that alleged breach concealment, suppression, or omission, or unfair or deceptive practice having rendered the Paraquat "misbranded" under FIFRA. However, Plaintiffs bring claims and seek relief in this action only under state law. Plaintiffs do not bring any claims or seek any relief in this action under FIFRA.

183.    Plaintiffs' causes of action are solely under state law.

## CAUSES OF ACTION

### COUNT I—STRICT PRODUCTS LIABILITY DESIGN DEFECT AGAINST SYNGENTA

184.    Plaintiffs incorporate all other allegations herein.

185.    Syngenta designed, manufactured, and sold Paraquat that Mr. Kagawa was exposed to.

186.    Mr. Kagawa's exposure to Paraquat caused Mr. Kagawa's Parkinson's disease or precursor ailment that will progress into Parkinson's disease.

187.    Mr. Kagawa was an ordinary consumer of Paraquat or was exposed by virtue of his close contact with ordinary consumers of Paraquat.

188.    Paraquat did not perform as safely as an ordinary consumer would have expected it to perform when used in an intended way, including:

a.    An ordinary end-user of Paraquat would not have expected Paraquat to cross the blood-brain barrier and cause neurological injury even when personal protective equipment was used.

b.    An ordinary end-user of Paraquat would not have expected Paraquat to cross the blood-brain barrier and cause neurological injury even when personal protective equipment was not used.

     c.     An ordinary end-user of Paraquat would not have expected Paraquat to cause Parkinson's disease or precursor ailment.

189.    Paraquat did not perform as safely as an ordinary consumer would have expected it to perform when used in an unintended but reasonably foreseeable way, including:

     a.     An ordinary end-user of Paraquat would not have expected Paraquat to cross the blood-brain barrier and cause neurological injury even when personal protective equipment was used.

     b.     An ordinary end-user of Paraquat would not have expected Paraquat to cross the blood-brain barrier and cause neurological injury even when personal protective equipment was not used.

     c.     An ordinary end-user of Paraquat would not have expected Paraquat to cause Parkinson's disease or precursor ailment.

190.    Further, a reasonable person would conclude that possibility and seriousness of neurological injury caused by Paraquat, including Parkinson's disease and precursor ailments, outweighed the burden or cost of making Paraquat safe. In particular:

     a.     It is highly likely that low-dose Paraquat exposure will result in neurological injury including Parkinson's disease or a precursor ailment that will progress into Parkinson's disease.

     b.     Parkinson's disease is degenerative and chronic; there is no cure. Parkinson's disease causes intense suffering and a breakdown of the ability to live a normal life. Parkinson's disease is fatal.

     c.     The burden of making Paraquat safer was lesser than (i.e., outweighed by) the risk and seriousness of the injuries Paraquat causes.

     d.     The cost of making Paraquat safer was lesser than (i.e., outweighed by) the risk and seriousness of the injuries Paraquat causes.

191.    The Paraquat to which Mr. Kagawa was exposed was unreasonably dangerous when it left Syngenta's possession and control.

WHEREFORE, Plaintiffs respectfully request that this Court enter judgment in Plaintiffs' favor for compensatory and punitive damages, together with interest, costs herein incurred,

attorneys' fees and all such other and further relief as this Court deems just and proper. Plaintiffs also demand a jury trial on the issues contained herein.

## COUNT II—STRICT PRODUCTS LIABILITY DESIGN DEFECT AGAINST CHEVRON

192.    Plaintiffs incorporates all other allegations herein.

193.    Chevron designed, manufactured, and sold Paraquat that Mr. Kagawa was exposed to.

194.    Mr. Kagawa's exposure to Paraquat caused his Parkinson's disease or precursor ailment that will progress into Parkinson's disease.

195.    Mr. Kagawa was an ordinary consumer of Paraquat or was exposed by virtue of Mr. Kagawa's close contact with ordinary consumers of Paraquat.

196.    Paraquat did not perform as safely as an ordinary consumer would have expected it to perform when used in an intended way, including:

> a.    An ordinary end-user of Paraquat would not have expected Paraquat to cross the blood-brain barrier and cause neurological injury even when personal protective equipment was used.

> b.    An ordinary end-user of Paraquat would not have expected Paraquat to cross the blood-brain barrier and cause neurological injury even when personal protective equipment was not used.

> c.    An ordinary end-user of Paraquat would not have expected Paraquat to cause Parkinson's disease or precursor ailment.

197.    Paraquat did not perform as safely as an ordinary consumer would have expected it to perform when used in an unintended but reasonably foreseeable way, including:

> a.    An ordinary end-user of Paraquat would not have expected Paraquat to cross the blood-brain barrier and cause neurological injury even when personal protective equipment was used.

b.      An ordinary end-user of Paraquat would not have expected Paraquat to cross the blood-brain barrier and cause neurological injury even when personal protective equipment was not used.

c.      An ordinary end-user of Paraquat would not have expected Paraquat to cause Parkinson's disease or precursor ailment.

198.    Further, a reasonable person would conclude that possibility and seriousness of neurological injury caused by Paraquat, including Parkinson's disease and precursor ailments, outweighed the burden or cost of making Paraquat safe. In particular:

a.      It is highly likely that low-dose Paraquat exposure will result in neurological injury including Parkinson's disease or a precursor ailment that will progress into Parkinson's disease.

b.      Parkinson's disease is degenerative and chronic; there is no cure. Parkinson's disease causes intense suffering and a breakdown of the ability to live a normal life. Parkinson's disease is fatal.

c.      The burden of making Paraquat safer was lesser than (i.e., outweighed by) the risk and seriousness of the injuries Paraquat causes.

d.      The cost of making Paraquat safer was lesser than (i.e., outweighed by) the risk and seriousness of the injuries Paraquat causes.

199.    The Paraquat to which Mr. Kagawa was exposed was unreasonably dangerous when it left Chevron's possession and control.

WHEREFORE, Plaintiffs respectfully request that this Court enter judgment in Plaintiffs' favor for compensatory and punitive damages, together with interest, costs herein incurred, attorneys' fees and all such other and further relief as this Court deems just and proper. Plaintiff also demands a jury trial on the issues contained herein.

## COUNT III—STRICT PRODUCTS LIABILITY FAILURE TO WARN AGAINST SYNGENTA

200.    Plaintiffs incorporate all other allegations herein.

38

201.    Syngenta is also liable to Plaintiffs under a products liability theory based on its failure to adequately warn of the risks of Paraquat.

202.    When Syngenta manufactured and sold the Paraquat to which Mr. Kagawa was exposed, it was known or knowable to Syngenta in light of scientific knowledge that was generally accepted in the scientific community as well as Syngenta's own internal research and information that:

a.    Paraquat was designed, manufactured, formulated, and packaged such that it was likely to be inhaled, ingested, and absorbed into the bodies of persons who used it, who were nearby while it was being used, or who entered fields or orchards where it had been sprayed or areas near where it had been sprayed.

b.    When inhaled, ingested, or absorbed into the body, it was likely cause latent neurological damage that was both permanent and cumulative, and that repeated, low- dose exposures were likely to cause neurodegenerative disease, including Parkinson's disease.

203.    The risk of contracting Parkinson's disease from low-dose exposure to Paraquat presented a substantial danger to users of Paraquat when the product was used in a reasonably foreseeable manner.

204.    An ordinary consumer would not have recognized the potential risk of permanent, irreversible neurological damage, including the risk of contracting Parkinson's disease, from low-dose exposure to Paraquat.

205.    Syngenta failed to warn of the potential risk of permanent, irreversible neurological damage from low-dose exposure to Paraquat.

206.    As a direct and proximate result of Syngenta marketing a defective product, Mr. Kagawa suffered the injuries described in this Complaint.

WHEREFORE, Plaintiffs respectfully request that this Court enter judgment in Plaintiffs' favor for compensatory and punitive damages, together with interest, costs herein incurred,

attorneys' fees and all such other and further relief as this Court deems just and proper. Plaintiffs also demand a jury trial on the issues contained herein.

## COUNT IV—STRICT PRODUCTS LIABILITY FAILURE TO WARN AGAINST CHEVRON

207.    Plaintiffs incorporate all other allegations herein.

208.    Chevron is also liable to Plaintiffs under a products liability theory based on its failure to adequately warn of the risks of Paraquat.

209.    When Chevron manufactured and sold the Paraquat to which Mr. Kagawa was exposed, it was known or knowable to Chevron in light of scientific knowledge that was generally accepted in the scientific community as well as Chevron's own internal research and information that:

     a.    Paraquat was designed, manufactured, formulated, and packaged such that it was likely to be inhaled, ingested, and absorbed into the bodies of persons who used it, who were nearby while it was being used, or who entered fields or orchards where it had been sprayed or areas near where it had been sprayed.

     b.    When inhaled, ingested, or absorbed into the body, it was likely cause latent neurological damage that was both permanent and cumulative, and that repeated, low- dose exposures were likely to cause neurodegenerative disease, including Parkinson's disease.

210.    The risk of contracting Parkinson's disease from low-dose exposure to Paraquat presented a substantial danger to users of Paraquat when the product was used in a reasonably foreseeable manner.

211.    An ordinary consumer would not have recognized the potential risk of permanent, irreversible neurological damage, including the risk of contracting Parkinson's disease, from low-dose exposure to Paraquat.

212.    Chevron failed to warn of the potential risk of permanent, irreversible neurological damage from low-dose exposure to Paraquat.

40

213.   As a direct and proximate result of Chevron marketing a defective product, Mr. Kagawa suffered the injuries described in this Complaint.

WHEREFORE, Plaintiffs respectfully request that this Court enter judgment in Plaintiffs' favor for compensatory and punitive damages, together with interest, costs herein incurred, attorneys' fees and all such other and further relief as this Court deems just and proper. Plaintiffs also demand a jury trial on the issues contained herein.

### COUNT V—STRICT PRODUCTS LIABILITY FAILURE TO WARN AGAINST YAMASHIRO BUILDING & SUPPLY, INC.

214.   Plaintiffs incorporate all other allegations herein.

215.   Yamashiro Building & Supply, Inc. is also liable to Plaintiffs under a products liability theory based on its failure to adequately warn of the risks of Paraquat.

216.   When Yamashiro Building & Supply, Inc. participated in the marketing and promotion of Paraquat to which Mr. Kagawa was exposed, it was known or knowable to Yamashiro Building & Supply, Inc. in light of scientific knowledge that was generally accepted in the scientific community that:

    a.   Paraquat was designed, manufactured, formulated, and packaged such that it was likely to be inhaled, ingested, and absorbed into the bodies of persons who used it, who were nearby while it was being used, or who entered fields or orchards where it had been sprayed or areas near where it had been sprayed.

    b.   When inhaled, ingested, or absorbed into the body, it was likely cause latent neurological damage that was both permanent and cumulative, and that repeated, low- dose exposures were likely to cause neurodegenerative disease, including Parkinson's disease.

217.   The risk of contracting Parkinson's disease from low-dose exposure to Paraquat presented a substantial danger to users of Paraquat when the product was used in a reasonably foreseeable manner.

218.     An ordinary consumer would not have recognized the potential risk of permanent, irreversible neurological damage, including the risk of contracting Parkinson's disease, from low-dose exposure to Paraquat.

219.     Yamashiro Building & Supply, Inc. failed to warn of the potential risk of permanent, irreversible neurological damage from low-dose exposure to Paraquat.

220.     As a direct and proximate result of Yamashiro Building & Supply, Inc. marketing a defective product, Mr. Kagawa suffered the injuries described in this Complaint.

WHEREFORE, Plaintiffs respectfully request that this Court enter judgment in Plaintiffs' favor for compensatory and punitive damages, together with interest, costs herein incurred, attorneys' fees and all such other and further relief as this Court deems just and proper. Plaintiffs also demand a jury trial on the issues contained herein.

## COUNT VI—NEGLIGENCE AGAINST SYNGENTA

221.     Plaintiffs incorporate all other allegations herein.

222.     Syngenta designed, manufactured, distributed, and sold Paraquat to which Mr. Kagawa was exposed.

223.     The Paraquat to which Mr. Kagawa was exposed was used in the intended and/or reasonably foreseeable manner.

224.     At all times relevant to this claim, in researching, designing, manufacturing, packaging, labeling, distributing, and selling Paraquat, Syngenta owed a duty to exercise ordinary care for the health and safety of the persons whom it was reasonably foreseeable could be exposed to Paraquat, including Mr. Kagawa.

225.     When Syngenta designed, manufactured, packaged, labeled, distributed, and sold the Paraquat to which Mr. Kagawa was exposed, it was reasonably foreseeable that Paraquat:

a. Was likely to be inhaled, ingested, and absorbed into the bodies of persons who used it, who were nearby while it was being used, or who entered fields or orchards where it had been sprayed or areas near where it had been sprayed.

b. When inhaled, ingested, or absorbed into the bodies of persons who used it, who were nearby while it was being used, or who entered fields or orchards where it has been sprayed or areas near where it has been sprayed, it was likely to cause neurological damage that was both permanent and cumulative, and repeated exposures were likely to cause neurodegenerative disease, including Parkinson's disease.

226. In breach of the aforementioned duties to Mr. Kagawa, Syngenta negligently:

a. Failed to design, manufacture, formulate, and package Paraquat to make it unlikely to be inhaled, ingested, and absorbed into the bodies of persons who used it, who were nearby while it was being used, or who entered fields or orchards where it had been sprayed or areas near where it had been sprayed.

b. Designed, manufactured, and formulated Paraquat such that it was likely to cause neurological damage that was both permanent and cumulative, and repeated exposures were likely to cause clinically significant neurodegenerative disease, including Parkinson's disease.

c. Failed to conduct adequate research and testing to determine the extent to which exposure to Paraquat was likely to occur through inhalation, ingestion, and absorption into the bodies of persons who used it, who were nearby while it was being used, or who entered fields or orchards where it had been sprayed or areas near where it had been sprayed.

d. Failed to conduct adequate research and testing to determine the extent to which Paraquat spray drift was likely to occur, including its propensity to drift, the distance it was likely to drift, and the extent to which Paraquat spray droplets were likely to enter the bodies of persons spraying it or other persons nearby during or after spraying.

e. Failed to conduct adequate research and testing to determine the extent to which Paraquat was likely to cause or contribute to cause latent neurological damage that was both permanent and cumulative, and the extent to which repeated exposures were likely to cause or contribute to cause clinically significant neurodegenerative disease, including Parkinson's disease.

f. Failed to direct that Paraquat be used in a manner that would have made it unlikely to be inhaled, ingested, and absorbed into the bodies of persons who used it, who were nearby while it was being used, or who entered fields or orchards where it had been sprayed or areas near where it had been sprayed.

43

g.      Failed to warn that Paraquat was likely to cause neurological damage that was permanent and cumulative, and repeated exposures were likely to cause clinically significant neurodegenerative disease, including Parkinson's disease.

227.    Syngenta knew or should have known that users would not realize the dangers of exposure to Paraquat and negligently failed to take reasonable steps to prevent the foreseeable risk of harm from exposure to Paraquat.

228.    As a direct and proximate result of Syngenta's negligence, Mr. Kagawa suffered the injuries described in this Complaint.

WHEREFORE, Plaintiffs respectfully request that this Court enter judgment in Plaintiffs' favor for compensatory and punitive damages, together with interest, costs herein incurred, attorneys' fees and all such other and further relief as this Court deems just and proper. Plaintiffs also demand a jury trial on the issues contained herein.

## COUNT VII—NEGLIGENCE AGAINST CHEVRON

229.    Plaintiffs incorporate all other allegations herein.

230.    Chevron designed, manufactured, distributed, and sold Paraquat to which Mr. Kagawa was exposed.

231.    The Paraquat to which Mr. Kagawa was exposed was used in the intended and/or reasonably foreseeable manner.

232.    At all times relevant to this claim, in researching, designing, manufacturing, packaging, labeling, distributing, and selling Paraquat, Chevron owed a duty to exercise ordinary care for the health and safety of the persons whom it was reasonably foreseeable could be exposed to Paraquat, including Mr. Kagawa.

233.    When Chevron designed, manufactured, packaged, labeled, distributed, and sold the Paraquat to which Mr. Kagawa was exposed, it was reasonably foreseeable that Paraquat:

a.      Was likely to be inhaled, ingested, and absorbed into the bodies of persons who used it, who were nearby while it was being used, or who entered fields or orchards where it had been sprayed or areas near where it had been sprayed.

b.      When inhaled, ingested, or absorbed into the bodies of persons who used it, who were nearby while it was being used, or who entered fields or orchards where it has been sprayed or areas near where it has been sprayed, it was likely to cause neurological damage that was both permanent and cumulative, and repeated exposures were likely to cause neurodegenerative disease, including Parkinson's disease.

234.    In breach of the aforementioned duties to Mr. Kagawa, Chevron negligently:

a.       Failed to design, manufacture, formulate, and package Paraquat to make it unlikely to be inhaled, ingested, and absorbed into the bodies of persons who used it, who were nearby while it was being used, or who entered fields or orchards where it had been sprayed or areas near where it had been sprayed.

b.      Designed, manufactured, and formulated Paraquat such that it was likely to cause neurological damage that was both permanent and cumulative, and repeated exposures were likely to cause clinically significant neurodegenerative disease, including Parkinson's disease.

c.      Failed to conduct adequate research and testing to determine the extent to which exposure to Paraquat was likely to occur through inhalation, ingestion, and absorption into the bodies of persons who used it, who were nearby while it was being used, or who entered fields or orchards where it had been sprayed or areas near where it had been sprayed.

d.      Failed to conduct adequate research and testing to determine the extent to which Paraquat spray drift was likely to occur, including its propensity to drift, the distance it was likely to drift, and the extent to which Paraquat spray droplets were likely to enter the bodies of persons spraying it or other persons nearby during or after spraying.

e.      Failed to conduct adequate research and testing to determine the extent to which Paraquat was likely to cause or contribute to cause latent neurological damage that was both permanent and cumulative, and the extent to which repeated exposures were likely to cause or contribute to cause clinically significant neurodegenerative disease, including Parkinson's disease.

f.      Failed to direct that Paraquat be used in a manner that would have made it unlikely to be inhaled, ingested, and absorbed into the bodies of persons who used it, who were nearby while it was being used, or who entered fields or orchards where it had been sprayed or areas near where it had been sprayed.

g.      Failed to warn that Paraquat was likely to cause neurological damage that was both permanent and cumulative, and repeated exposures were likely to cause clinically significant neurodegenerative disease, including Parkinson's disease.

235.    Chevron knew or should have known that users would not realize the dangers of exposure to Paraquat and negligently failed to take reasonable steps to prevent the foreseeable risk of harm from exposure to Paraquat.

236.    As a direct and proximate result of Chevron's negligence, Mr. Kagawa suffered the injuries described in this Complaint.

WHEREFORE, Plaintiffs respectfully request that this Court enter judgment in Plaintiffs' favor for compensatory and punitive damages, together with interest, costs herein incurred, attorneys' fees and all such other and further relief as this Court deems just and proper. Plaintiffs also demand a jury trial on the issues contained herein.

## COUNT VIII —NEGLIGENCE AGAINST YAMASHIRO BUILDING & SUPPLY, INC.

237.    Plaintiffs incorporates all other allegations herein.

238.    Yamashiro Building & Supply, Inc. marketed and promoted misleading safety information related to Paraquat during the timeframes in which Mr. Kagawa was exposed.

239.    The Paraquat to which Mr. Kagawa was exposed was used in the intended and/or a reasonably foreseeable manner.

240.    At all times relevant to this claim, in marketing and promoting Paraquat, Yamashiro Building & Supply, Inc.  owed a duty to exercise ordinary care for the health and safety of the persons whom it was reasonably foreseeable could be exposed to Paraquat, including Mr. Kagawa.

241.    When Yamashiro Building & Supply, Inc.  marketed and promoted Paraquat during the timeframe to which Mr. Kagawa was exposed, it was reasonably foreseeable that Paraquat:

    a.    Was likely to be inhaled, ingested, and absorbed into the bodies of persons who used it, who were nearby while it was being used, or who entered fields or orchards where it had been sprayed or areas near where it had been sprayed.

b.      When inhaled, ingested, or absorbed into the bodies of persons who used it, who were nearby while it was being used, or who entered fields or orchards where it has been sprayed or areas near where it has been sprayed, it was likely to cause neurological damage that was both permanent and cumulative, and repeated exposures were likely to cause neurodegenerative disease, including Parkinson's disease.

242.    In breach of the aforementioned duties to Mr. Kagawa, Yamashiro Building & Supply, Inc.  negligently:

a.      Failed to conduct adequate research and testing to determine the extent to which exposure to Paraquat was likely to occur through inhalation, ingestion, and absorption into the bodies of persons who used it, who were nearby while it was being used, or who entered fields or orchards where it had been sprayed or areas near where it had been sprayed.

b.      Failed to conduct adequate research and testing to determine the extent to which Paraquat was likely to cause or contribute to cause latent neurological damage that was both permanent and cumulative, and the extent to which repeated exposures were likely to cause or contribute to cause clinically significant neurodegenerative disease, including Parkinson's disease.

c.      Failed to direct that Paraquat be used in a manner that would have made it unlikely to be inhaled, ingested, and absorbed into the bodies of persons who used it, who were nearby while it was being used, or who entered fields or orchards where it had been sprayed or areas near where it had been sprayed.

d.      Failed to warn that Paraquat was likely to cause neurological damage that was both permanent and cumulative, and repeated exposures were likely to cause clinically significant neurodegenerative disease, including Parkinson's disease.

243.    Yamashiro Building & Supply, Inc.  knew or should have known that users would not realize the dangers of exposure to Paraquat and negligently failed to take reasonable steps to prevent the foreseeable risk of harm from exposure to Paraquat.

244.    As a direct and proximate result of Yamashiro Building & Supply, Inc.'s negligence, Mr. Kagawa suffered the injuries described in this Complaint.

WHEREFORE, Plaintiffs respectfully request that this Court enter judgment in Plaintiffs' favor for compensatory and punitive damages, together with interest, costs herein incurred,

attorneys' fees and all such other and further relief as this Court deems just and proper. Plaintiffs also demand a jury trial on the issues contained herein.

## COUNT IX—BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY AGAINST SYNGENTA

245.    Plaintiffs incorporate all other allegations herein.

246.    At all relevant times Syngenta engaged in the business of designing, manufacturing, distributing, and selling Paraquat and other pesticides and held themselves out as having special knowledge or skill regarding Paraquat and other pesticides.

247.    At all relevant times, Syngenta designed, manufactured, distributed, and sold Paraquat for use in Hawaii and nationally.

248.    Mr. Kagawa was exposed to Paraquat that Syngenta marketed, designed, manufactured, distributed, and/or sold.

249.    The Paraquat to which Mr. Kagawa was exposed was not fit for the ordinary purposes for which it was used, and in particular:

      a.    It was designed, manufactured, formulated, and packaged such that it was likely to be inhaled, ingested, and absorbed into the bodies of persons who used it, who were nearby while it was being used, or who entered fields or orchards where it had been sprayed or areas near where it had been sprayed.

      b.    When inhaled, ingested, or absorbed into the bodies of persons who used it, who were nearby while it was being used, or who entered fields or orchards where it had been sprayed or areas near where it had been sprayed, it was likely to cause neurological damage that was both permanent and cumulative, and repeated exposures were likely to cause neurodegenerative disease, including Parkinson's disease.

250.    As a direct and proximate result of Syngenta's breach of implied warranty, Mr. Kagawa suffered the injuries alleged in this Complaint.

WHEREFORE, Plaintiffs respectfully request that this Court enter judgment in Plaintiffs' favor for compensatory and punitive damages, together with interest, costs herein incurred,

attorneys' fees and all such other and further relief as this Court deems just and proper. Plaintiffs also demand a jury trial on the issues contained herein.

## COUNT X—BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY AGAINST CHEVRON

251.    Plaintiffs incorporate all other allegations herein.

252.    At all relevant times Chevron engaged in the business of designing, manufacturing, distributing, and selling Paraquat and other pesticides and held themselves out as having special knowledge or skill regarding Paraquat and other pesticides.

253.    At all relevant times, Chevron designed, manufactured, distributed, and sold Paraquat for use in Hawaii and nationally.

254.    Mr. Kagawa was exposed to Paraquat that Chevron marketed, designed, manufactured, distributed, and/or sold.

255.    The Paraquat to which Mr. Kagawa was exposed was not fit for the ordinary purposes for which it was used, and in particular:

        a.      It was designed, manufactured, formulated, and packaged such that it was likely to be inhaled, ingested, and absorbed into the bodies of persons who used it, who were nearby while it was being used, or who entered fields or orchards where it had been sprayed or areas near where it had been sprayed.

        b.      When inhaled, ingested, or absorbed into the bodies of persons who used it, who were nearby while it was being used, or who entered fields or orchards where it had been sprayed or areas near where it had been sprayed, it was likely to cause neurological damage that was both permanent and cumulative, and repeated exposures were likely to cause neurodegenerative disease, including Parkinson's disease.

256.    As a direct and proximate result Chevron's breach of implied warranty, Mr. Kagawa suffered the injuries alleged in this Complaint.

WHEREFORE, Plaintiffs respectfully request that this Court enter judgment in Plaintiffs' favor for compensatory and punitive damages, together with interest, costs herein incurred,

attorneys' fees and all such other and further relief as this Court deems just and proper. Plaintiffs also demand a jury trial on the issues contained herein.

## COUNT XI
## FRAUD, MISREPRESENTATION, AND SUPPRESSION AGAINST SYNGENTA

257.    Plaintiffs incorporate by reference all of the above paragraphs as if set forth in full herein.

258.    Defendant Syngenta fraudulently, intentionally, and/or negligently misrepresented to the public, and to Mr. Kagawa, both directly and by and through the media and the scientific literature, the safety of Paraquat products, and/or fraudulently, intentionally, and/or negligently concealed, suppressed, or omitted material, adverse information regarding the safety of Paraquat.

259.    The intentional and/or negligent misrepresentations and omissions of the Defendant regarding the safety of Paraquat products were communicated to Mr. Kagawa directly through scientific articles and editorials generated by Syngenta and propagated through the internet and other media, national and regional advertising, marketing and promotion efforts, as well as the packaging and sales aids.  The safety of Paraquat products was also intentionally and/or negligently misrepresented to Mr. Kagawa and the public with the intent that such misrepresentations would cause Mr. Kagawa  and other potential consumers to purchase and use or continue to purchase and use Paraquat products.

260.    Defendant either knew or should have known of the material representations they were making regarding the safety and relative utility of Paraquat products.

261.    Defendant fraudulently, intentionally, and/or negligently made the misrepresentations and/or actively concealed, suppressed, or omitted this material information with the specific desire to induce Mr. Kagawa, and the consuming public to purchase and use

Paraquat products. Defendant fraudulently, intentionally, and/or negligently, knew or should have known that Mr. Kagawa and the consuming public would rely on such material misrepresentations and/or omissions in selecting and applying Paraquat products.  Defendant knew or should have known that Mr. Kagawa would rely on their false representations and omissions.

262.    Defendants made these misrepresentations and actively concealed adverse information including the risk of Parkinson's disease, at a time when, their agents and/or employees knew or should have known, the product had defects, dangers, and characteristics that were other than what was represented to the consuming public.  Despite the fact that Defendant knew or should have known of reports of severe risks including Parkinson's Disease with Paraquat use and exposure, this information was strategically minimized, understated, or omitted.

263.    The fraudulent, intentional and/or negligent material misrepresentations and/or active concealment, suppression, and omissions by Defendant was perpetuated directly and/or indirectly through the advertisements, packaging, sales aids, furtive public relations efforts, and other marketing and promotional pieces authored, analyzed, created, compiled, designed, drafted, disseminated, distributed, edited, evaluated, marketed, published, and supplied by Defendant.

264.    If Mr. Kagawa had known the true facts concerning the risks associated with Paraquat exposure, Mr. Kagawa would have used a safer alternative.

265.    Mr. Kagawa's reliance upon the material misrepresentations and omissions was justified, among other reasons, because said misrepresentations and omissions were made by individuals and entities who were in a position to know the true facts concerning Paraquat while Mr. Kagawa was not in a position to know the true facts because Defendant overstated the benefits and safety of Paraquat and downplayed the risk of Parkinson's Disease, thereby inducing Mr. Kagawa to use the herbicide rather than safer alternatives.

266.     As a direct and proximate result of Defendant's actions and inactions, Mr. Kagawa was exposed to Paraquat and suffered injuries and damages, as set forth herein.

WHEREFORE, Plaintiffs respectfully request that this Court enter judgment in Plaintiffs' favor for compensatory and punitive damages, together with interest, costs herein incurred, attorneys' fees and all such other and further relief as this Court deems just and proper. Plaintiffs also demand a jury trial on the issues contained herein.

## COUNT XII

## FRAUD, MISREPRESENTATION, AND SUPPRESION AGAINST YAMASHIRO BUILDING & SUPPLY, INC.

267.     Plaintiffs incorporate by reference all of the above paragraphs as if set forth in full herein.

268.     Defendant Yamashiro Building & Supply, Inc. fraudulently, intentionally, and/or negligently misrepresented to the public, and to Mr. Kagawa, both directly and by and through the media and the scientific literature, the safety of Paraquat products, and/or fraudulently, intentionally, and/or negligently concealed, suppressed, or omitted material, adverse information regarding the safety of Paraquat.

269.     The intentional and/or negligent misrepresentations and omissions of the Defendant regarding the safety of Paraquat products were communicated to Mr. Kagawa directly through scientific articles and editorials generated by Defendants and propagated through the internet and other media, national and regional advertising, marketing and promotion efforts, as well as the packaging and sales aids.  The safety of Paraquat products was also intentionally and/or negligently misrepresented to Mr. Kagawa and the public with the intent that such misrepresentations would cause Mr. Kagawa and other potential consumers to purchase and use or continue to purchase and use Paraquat products.

270.     Defendant either knew or should have known of the material representations they were making regarding the safety and relative utility of Paraquat products.

271.     Defendant  fraudulently,  intentionally,  and/or  negligently  made  the misrepresentations and/or actively concealed, suppressed, or omitted this material information with the specific desire to induce Mr. Kagawa, and the consuming public to purchase and use Paraquat products. Defendant fraudulently, intentionally, and/or negligently, knew or should have known that Mr. Kagawa and the consuming public would rely on such material misrepresentations and/or omissions in selecting and applying Paraquat products.  Defendant knew or should have known that Mr. Kagawa would rely on their false representations and omissions.

272.     Defendant  made  these  misrepresentations  and  actively  concealed  adverse information including the risk of Parkinson's Disease, at a time when, their agents and/or employees knew or should have known, the product had defects, dangers, and characteristics that were other than what was represented to the consuming public.  Despite the fact that Defendant knew or should have known of reports of severe risks including Parkinson's Disease with Paraquat use and exposure, this information was strategically minimized, understated, or omitted.

273.     The  fraudulent,  intentional  and/or  negligent  material  misrepresentations  and/or active concealment, suppression, and omissions by Defendant was perpetuated directly and/or indirectly through the advertisements, packaging, sales aids, furtive public relations efforts, and other marketing and promotional pieces authored, analyzed, created, compiled, designed, drafted, disseminated, distributed, edited, evaluated, marketed, published, and supplied by Defendant.

274.     If Mr. Kagawa had known the true facts concerning the risks associated with Paraquat exposure, Mr. Kagawa would have used a safer alternative.

275.     Mr. Kagawa's reliance upon the material misrepresentations and omissions was justified, among other reasons, because said misrepresentations and omissions were made by individuals and entities who were in a position to know the true facts concerning Paraquat while Mr. Kagawa was not in a position to know the true facts because Defendant overstated the benefits and safety of Paraquat and downplayed the risk of Parkinson's Disease, thereby inducing Mr. Kagawa to use the herbicide rather than safer alternatives.

276.     As a direct and proximate result of Defendant's actions and inactions, Mr. Kagawa was exposed to Paraquat and suffered and will continue to suffer injuries and damages, as set forth herein.

WHEREFORE, Plaintiffs respectfully request that this Court enter judgment in Plaintiffs' favor for compensatory and punitive damages, together with interest, costs herein incurred, attorneys' fees and all such other and further relief as this Court deems just and proper. Plaintiffs also demand a jury trial on the issues contained herein.

## COUNT XIII

## FRAUDULENT CONCEALMENT OF CAUSE OF ACTION AGAINST SYNGENTA PURSUANT TO HAWAII § 657-20

277.     Plaintiffs incorporate by reference all of the above paragraphs as if set forth in full.

278.     Syngenta knew it would be subject to lawsuits by Paraquat users who developed if the public became aware of the scientific data linking Paraquat to Parkinson's disease.

279.     Syngenta engaged in an intentional fraudulent effort to prevent its past customers from finding out truthful information about the link between Paraquat and Parkinson's disease in order to forestall lawsuits against it.  Syngenta further took affirmative steps to fraudulently manipulate the scientific literature, the media, and regulatory agencies to promote a false message

that Paraquat was safe and was not neurotoxic. Syngenta's actions included monitoring internet searches by the public related to Parkinson's disease litigation; and to develop strategies to prevent such searches from bringing up websites containing information about linking Paraquat to Parkinson's disease.

280.    For years, Syngenta's actions concealed from Mr. Kagawa the fact that Mr. Kagawa had a claim against Defendant.  Syngenta profited off this delay while Mr. Kagawa continued to suffer without obtaining justice or compensation for his injuries.

WHEREFORE, Plaintiffs respectfully request that this Court enter judgment in Plaintiffs' favor for compensatory and punitive damages, together with interest, costs herein incurred, attorneys' fees and all such other and further relief as this Court deems just and proper. Plaintiffs also demand a jury trial on the issues contained herein.

## COUNT XIV

## VIOLATION OF THE CONSUMER FRAUD ACTS AGAINST ALL DEFENDANTS

281.    Plaintiffs incorporate by reference all of the above paragraphs as if set forth in full.

282.    Defendants fraudulently, intentionally, and/or negligently misrepresented to the public, and to Mr. Kagawa, both directly and by and through the media and the scientific literature, the safety of Paraquat products, and/or fraudulently, intentionally, and/or negligently concealed, suppressed, or omitted material, adverse information regarding the safety of Paraquat. This deception caused injury to Mr. Kagawa in violation of the Consumer Fraud Acts of Hawaii which create private rights of action by Mr. Kagawa.

283.    The intentional and/or negligent misrepresentations and omissions of the Defendants regarding the safety of Paraquat products were communicated to Mr. Kagawa directly through scientific articles and editorials generated by Defendants and propagated through the

internet and other media, national and regional advertising, marketing and promotion efforts, as well as the packaging and sales aids.  The safety of Paraquat products was also intentionally and/or negligently misrepresented to Mr. Kagawa and the public with the intent that such misrepresentations would cause Mr. Kagawa and other potential consumers to purchase and use or continue to purchase and use Paraquat products.

284.    Defendants either knew or should have known of the material representations they were making regarding the safety and relative utility of Paraquat products.

285.    Defendants fraudulently, intentionally, and/or negligently made the misrepresentations and/or actively concealed, suppressed, or omitted this material information with the specific desire to induce Mr. Kagawa, and the consuming public to purchase and use Paraquat products. Defendants fraudulently, intentionally, and/or negligently, knew or should have known that Mr. Kagawa and the consuming public would rely on such material misrepresentations and/or omissions in selecting and applying Paraquat products.  Defendants knew or should have known that Mr. Kagawa would rely on their false representations and omissions.

286.    Defendants made these misrepresentations and actively concealed adverse information including the risk of Parkinson's Disease, at a time when, their agents and/or employees knew or should have known, the product had defects, dangers, and characteristics that were other than what was represented to the consuming public.  Despite the fact that Defendants knew or should have known of reports of severe risks including Parkinson's Disease with Paraquat use and exposure, this information was strategically minimized, understated, or omitted.

287.    The fraudulent, intentional and/or negligent material misrepresentations and/or active concealment, suppression, and omissions by Defendants was perpetuated directly and/or indirectly through the advertisements, packaging, sales aids, furtive public relations efforts, and

other marketing and promotional pieces authored, analyzed, created, compiled, designed, drafted, disseminated, distributed, edited, evaluated, marketed, published, and supplied by Defendants.

288.    If Mr. Kagawa had known the true facts concerning the risks associated with Paraquat exposure, Mr. Kagawa would have used a safer alternative.

289.    Mr. Kagawa's reliance upon the material misrepresentations and omissions was justified, among other reasons, because said misrepresentations and omissions were made by individuals and entities who were in a position to know the true facts concerning Paraquat while Mr. Kagawa was not in a position to know the true facts because Defendants overstated the benefits and safety of Paraquat and downplayed the risk of Parkinson's Disease, thereby inducing Mr. Kagawa to use the herbicide rather than safer alternatives.

290.    As a direct and proximate result of Defendants' actions and inactions, Mr. Kagawa was exposed to Paraquat and suffered injuries and damages, as set forth herein.

WHEREFORE, Plaintiffs respectfully request that this Court enter judgment in Plaintiffs' favor for compensatory and punitive damages, together with interest, costs herein incurred, attorneys' fees and all such other and further relief as this Court deems just and proper. Plaintiffs also demand a jury trial on the issues contained herein.

## COUNT XV

## WRONGFUL DEATH AGAINST ALL DEFENDANTS

291.    Plaintiffs repeat and reiterate the allegations previously set forth herein.

292.    Plaintiff Kathleen Kaizuka is the child of her late father, Hiroshi Kagawa, and a surviving heir of the decedent and is authorized to bring an action for the wrongful death of Hiroshi Kagawa.

293.   The injuries and damages of Mr. Kagawa were caused by the wrongful acts, omissions, and fraudulent misrepresentations of Defendants.

294.   As a result of the conduct of Defendants and ingestion of Defendant's Paraquat product, the Decedent Mr. Kagawa suffered fatal injuries.

295.   As a result of the death of decedent, statutory beneficiaries of decedent were deprived of love, companionship, comfort, support, affection, society, solace, and moral support of the decedent.

296.   Plaintiff Kathleen Kaizuka is entitled to recover economic and non-economic damages against all Defendants for wrongful death directly and legally caused by the defects in Defendants' product and the negligent conduct, acts, errors, omissions and intentional and negligent misrepresentations of Defendants, and each of them.

297.   As a direct and proximate result of Defendants' negligence, decedent's beneficiaries, suffered damages as a result of decedent's death including funeral and burial expenses, loss of services, loss of society, loss of companionship, consortium, care, assistance, attention, protection, guidance, counsel, instruction, and mental anguish.

WHEREFORE, Plaintiffs respectfully request that this Court enter judgment in Plaintiffs' favor for compensatory and punitive damages, together with interest, costs herein incurred, attorneys' fees and all such other and further relief as this Court deems just and proper. Plaintiffs also demand a jury trial on the issues contained herein.

## COUNT XVI

## SURVIVAL ACTION

298.   Plaintiffs incorporate by reference all other paragraphs in this Complaint as if set forth fully herein.

299.     As a direct and proximate result of the acts and/or omissions of Defendants as set forth herein, the decedent named in this action used Paraquat.  Subsequent to such use, decedent developed Parkinson's Disease, suffered substantial pain and suffering, both physical and emotional in nature, and subsequently died.

300.     Plaintiff Kathleen Kaizuka, on behalf of herself and all of the next of kin or successors-in-interest of decedents, is entitled to recover damages as decedent would have if they were living, as a result of acts and/or omissions of Defendants.

301.     Plaintiff Kathleen Kaizuka, on behalf of herself and all of decedent's next of kin or successors-in-interest is also entitled to recover punitive damages and damages for substantial pain and suffering caused to decedent from the acts and/or omissions of Defendants as fully set forth herein, including without limitations, punitive damages.

302.     As a direct and proximate result of Defendants' conduct, Plaintiff Kathleen Kaizuka and decedent have been injured and sustained severe and permanent pain, suffering, disability, impairment, loss of enjoyment of life, loss of care and comfort, and economic damages.

WHEREFORE, Plaintiffs respectfully request that this Court enter judgment in Plaintiffs' favor for compensatory and punitive damages, together with interest, costs herein incurred, attorneys' fees and all such other and further relief as this Court deems just and proper. Plaintiffs also demand a jury trial on the issues contained herein.

## DEMAND FOR JURY TRIAL

303.     Plaintiffs incorporate all other allegations, including all causes of action, herein.

304.     Plaintiffs demand a jury trial on all issues contained herein.

## **PRAYER FOR RELIEF**

305.    WHEREFORE, Plaintiffs request that this Court to enter judgment in Plaintiffs' favor and against the Defendants for:

      a.  actual or compensatory damages in such amount to be determined at trial and as provided by applicable law;

      b.  exemplary and punitive damages sufficient to punish and deter the Defendants and others from future fraudulent practices;

      c.  pre-judgment and post-judgment interest;

      d.  costs including reasonable attorneys' fees, court costs, and other litigation expenses; and

      e.  any other relief the Court may deem just and proper.

DATED:  Honolulu, Hawaii, April 11, 2024.

                                          */s/ Sofia Hirosane McGuire*
                                        JAMES H.Q. LEE
                                        THOMAS J. WONG
                                        SOFIA HIROSANE McGUIRE
                                        Attorneys for Plaintiffs
                                        KATHLEEN KAIZUKA, Individually
                                        and as the child of Hiroshi Kagawa

| **STATE OF HAWAI'I** **CIRCUIT COURT OF THE** **FIRST CIRCUIT** | **SUMMONS** TO ANSWER CIVIL COMPLAINT | |
|---|---|---|

**CASE NUMBER**

**PLAINTIFF'S NAME & ADDRESS, TEL. NO.**

KATHLEEN KAIZUKA, INDIVIDUALLY, AND AS THE CHILD OF HIROSHI KAGAWA

c/o JAMES H.Q. LEE, ESQ.

DEVENS, NAKANO, SAITO, LEE, WONG & CHING

Central Pacific Plaza

220 South King Street, Suite 1600

Honolulu, Hawaii 96813

| **PLAINTIFF** VS. | **DEFENDANT(S)** |
|---|---|
| KATHLEEN KAIZUKA, INDIVIDUALLY, AND AS THE CHILD OF HIROSHI KAGAWA | SYNGENTA AG; SYNGENTA CROP PROTECTION, LLC;CHEVRON U.S.A. INC.; YAMASHIRO BUILDING & SUPPLY, INC.; JOHN DOES 1-10, JANE DOES 1-10, DOE PARTNERSHIPS, CORPORATIONS, or ENTITIES 1-20, Defendants. |

**TO THE ABOVE-NAMED DEFENDANT(S)**

You are hereby summoned and required to filed with the court and serve upon:

JAMES H.Q. LEE, ESQ.

DEVENS, NAKANO, SAITO, LEE, WONG & CHING

1600 Central Pacific Plaza

220 South King Street

_____,

plaintiff, as indicated above/whose address is stated above, an Answer to the Complaint / COMPLAINT                                          which is herewith served upon you, within 20 days after service of this summons upon you, exclusive of the date of service.  If you fail to do so, judgment by default will be taken against you for the relief demanded in the complaint.

**THIS SUMMONS SHALL NOT BE PERSONALLY DELIVERED BETWEEN 10:00 P.M. AND 6:00 A.M. ON PREMISES NOT OPEN TO THE GENERAL PUBLIC, UNLESS A JUDGE OF THE ABOVE-ENTITLED COURT PERMITS, IN WRITING ON THIS SUMMONS, PERSONAL DELIVERY DURING THOSE HOURS.**

**A FAILURE TO OBEY THIS SUMMONS MAY RESULT IN AN ENTRYOF DEFAULT AND DEFAULT JUDGMENT AGAINST THE DISOBEYING PERSON OR PARTY.**

| The original document is filed in the Judiciary's electronic case management system which is accessible via eCourt Kokua at: http:/www.courts.state.hi.us | **Effective Date of 28-Oct-2019** **Signed by: /s/ Patsy Nakamoto** **Clerk, 1st Circuit, State of Hawai'i** |  |
|---|---|---|

 In accordance with the Americans with Disabilities Act, and other applicable state and federal laws, if you require a reasonable accommodation for a disability, please contact the ADA Coordinator at the Circuit Court Administration Office on OAHU- Phone No. 808-539-4400, TTY 808-539-4853, FAX 539-4402, at least ten (10) working days prior to your hearing or appointment date.